FILED
COURT OF APPEALS
DIVISION II

2014 JUN 17 AM 8: 34

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43557-8-II |
| Respondent, | |
| v. | |
| TODD DALE PHELPS, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — In 2012, a jury found Todd Dale Phelps guilty of third degree rape and second degree sexual misconduct with a minor. Phelps appeals, arguing: (1) the trial court violated his and the public's right to an open and public trial during jury selection, (2) the trial court violated his right to be present during jury selection, (3) the information charging Phelps with second degree sexual misconduct with a minor was deficient, (4) the trial court failed to give a unanimity instruction for the second degree sexual misconduct with a minor charge, (5) the prosecutor committed misconduct during closing arguments, and (6) Phelps's trial counsel was ineffective for failing to object to prosecutorial misconduct during closing arguments. We affirm.

FACTS

A.     Background

In the summer of 2010, 16-year-old AA[1] played fastpitch softball on a travelling team with Todd Phelps's 18-year-old daughter. Phelps served as an assistant coach on the team. Because AA's family could not travel to her tournaments that summer, she generally travelled with the Phelpses and came to think of them as a "second family." 3 Report of Proceedings (RP) at 444. AA often stayed the night at the Phelps's home and viewed Phelps as a role model and father figure.

AA began experiencing personal issues during the summer that continued into the fall of her sophomore year. She cut herself, experienced depression, tried drugs, and contemplated suicide.

In the spring of 2011, AA began playing softball for the Pe Ell High School team. Phelps was a paid employee of the school, working as an assistant softball coach. Having heard rumors about AA's drug usage, Phelps confronted her during softball practice in March 2011. AA told Phelps about some of her personal issues, but later indicated through social media that she wanted to talk with him more.

On March 26, Phelps drove AA to watch a softball game between two rival schools. Before returning her home, Phelps stopped in a Pe Ell church parking lot to speak with AA. During their conversation in the car, Phelps graphically recounted to AA a number of his sexual experiences over the years. According to AA, Phelps related these stories so that she would have "dirt on him" and, in turn, she could trust him with her problems. 3 RP at 457. Phelps told AA

---

[1] To provide some confidentiality in this case, we use initials in the body of the opinion to identify the minor victim.

2

that he was going to help her get through her problems but, in return, she would need to repay him sexually once she turned 18. Phelps also told AA he would start texting her to make sure she was not cutting herself. When Phelps finally dropped AA at home, he instructed her to tell her parents that she was late getting home because they had stopped to eat.

Over the next few months, Phelps and AA texted each other thousands of times, often using other people's phones, and also communicated frequently through social media and e-mail. AA's parents and school officials became aware of Phelps's frequent communications with AA, and ultimately, Phelps was forced to resign his coaching position because of his involvement with AA. Additionally, Phelps engaged in the following conduct with AA during this time:

On April 2, Phelps engaged in sexual contact with AA.

On April 6, Phelps kissed AA.

On April 9, 12 and April 21, Phelps inappropriately touched AA.

On July 27, Phelps engaged in sexual intercourse with AA.

In September, AA disclosed having sexual intercourse with Phelps to her family. AA's father reported the incident to police.

B.     Procedure

On November 10, 2011, the State charged Phelps with third degree rape and second degree sexual misconduct with a minor. The State later amended the information to include two aggravating circumstances for the third degree rape charge: (1) that Phelps used his position of trust to facilitate the rape and (2) that AA was a particularly vulnerable victim.

Jury selection for Phelps's trial began on April 17, 2012. Prior to voir dire beginning, the court informed the parties that it would conduct hardship questioning at the beginning of voir

dire, reserve its ruling until just before peremptory challenges, then "inform counsel as to who will be excused." 1 RP (Voir Dire) at 3.

During voir dire, juror no. 28 indicated that serving on the jury would be an inconvenience because he had previously committed to chaperoning a trip. Juror no. 48 told the trial court that serving on the jury would create a hardship because he was the only income-earner in his household and his employer would not pay for jury duty. Without having excused either juror, the court then indicated that it would revisit hardship excusals later.

The trial court then questioned jurors about potential conflicts or bias. 1 RP (Voir Dire) at 8-10. The court asked whether any of the potential jurors had "read or heard anything about this matter," whether "what you heard or read [has] caused you to form any opinions that would affect your ability to sit as a fair and impartial juror," and whether anyone was "acquainted with the parties, their attorneys, or the potential witnesses." 1 RP (Voir Dire) at 9. Juror no. 62 raised his hand in response to all three questions.

During the State's voir dire, juror no. 62 stated:

I live in the town of Pe Ell. I know almost every person on [the witness] list. I know them from church. I know—my wife worked at the school, coached some of these girls. And I run the day care which has some of the family members there.

1 RP (Voir Dire) at 20. The following exchange then occurred:

[The Court]: . . . [C]ould I interrupt just for a moment?
[The State]: Yes.
[The Court]: Juror 62 was actually excused from this case earlier and I thought he knew that. You're Mr. Kephart; is that right?
[Juror no. 62]: Yes, sir.
[The Court]: Yes.
[Juror no. 62]: I was. But you also told me I had to come and go through the process, so I'm here.

4

[The Court]: I think we had a miscommunication. But you told me all of those things and I thought . . . Well, at any rate, your [sic] excused today—

1 RP (Voir Dire) at 21-22. Following a sidebar, voir dire continued with both parties eliciting responses from the venire. The parties then had a sidebar discussion to pick the jury. Juror no. 28 and 48 were not selected for the jury.

Phelps's jury trial began later that day. AA testified to the incidents described above and, specifically, that she did not consent to the July 27, 2011 sexual intercourse with Phelps. On cross-examination, Phelps's attorney questioned AA about whether she told prosecutors that she had consented to the intercourse:

> [Defense Attorney]: During one of your interviews or maybe more than one interview with [the prosecutor], did you tell her that you used the word rape later but the sex was consensual or that you consented?
> [AA]: No, I don't remember saying that.
> [Defense Attorney]: All right. And let me follow that up. When you tell us "I don't remember saying that," does that mean that you could have told [the prosecutor] that?
> [AA]: Because when it first happened I tried to make myself believe it was consensual anyways because I didn't want [Phelps]—I didn't want that to be who he was because, in all honesty, I really, really, really, really respected him. I didn't want this to happen. I didn't want to have to do this. But no, I don't remember ever saying that. But because of the fact that I tried to make myself believe that it was consensual, and there is a chance I probably could have said that.

5 RP at 880.

After the State rested, Phelps had four witnesses testify on his behalf: his mother, his wife, his daughter, and his sister-in-law. Phelps's mother testified that Phelps was with her at the time of the charged sexual misconduct on April 2. Phelps did not testify.

During closing arguments, Phelps's attorney argued that AA either consented to sexual intercourse with Phelps or that the July 27 incident never occurred. In its closing rebuttal, the

State commented that, "I got to be quite honest with you today, I didn't know the defense was one of consent." 8 RP at 1580. Following this, the State argued without objection that, even if a deputy prosecutor had written a note about consent during an interview with AA, the defense attorney was not there at the time and "has no idea of [what the] context was of the interview. He doesn't even know what the notes were about, but we're obligated to give them to him." 8 RP at 1582. The State then argued that looking at all the evidence—especially AA's trial testimony—it was clear that AA did not consent to sexual intercourse.

The jury found Phelps guilty of second degree sexual misconduct with a minor and third degree rape and also found, as aggravating factors to the rape conviction, that AA was particularly vulnerable and that Phelps used his position of trust to facilitate the rape. Phelps appeals.

## ANALYSIS

A.   PUBLIC TRIAL RIGHT

Phelps first argues that the trial court violated his and the public's right to a public trial when it privately excused jurors during voir dire and held various in-camera proceedings throughout trial. Because Phelps fails to meet his burden of establishing that public trial violations occurred, we disagree.

1. Standard of Review

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee a defendant the right to a public trial. *State v. Wise*, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012). This court reviews alleged violations of the public trial right de novo. *Wise*, 176 Wn.2d at 9.

Generally, a trial court must conduct the five-part test set forth in *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995), to determine if a closed proceeding is warranted.[2] However, "not every interaction between the court, counsel, and defendants will implicate the right to a public trial, or constitute a closure if closed to the public." *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). Accordingly, the threshold determination when addressing an alleged violation of the public trial right is whether the proceeding at issue even implicates the right. *Sublett*, 176 Wn.2d at 71.

In *Sublett*, the Washington Supreme Court adopted a two-part "experience and logic" test to address this issue: (1) whether the place and process historically have been open to the press and general public (experience prong), and (2) whether the public access plays a significant

---

[2] The five criteria in *Bone-Club* are:
  1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.
  2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
  3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
  4. The court must weigh the competing interests of the proponent of closure and the public.
  5. The order must be no broader in its application or duration than necessary to serve its purpose.

*Bone-Club*, 128 Wn.2d at 258-59 (alteration in original) (quoting *Allied Daily Newspapers of Washington v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)).

positive role in the functioning of a particular process in question (logic prong).[3] 176 Wn.2d at

72-73. Both questions must be answered affirmatively to implicate the public trial right. *Sublett*,

176 Wn.2d at 73. If the public trial right is implicated, reviewing courts then look at whether a

closure actually occurred without the requisite *Bone-Club* analysis. *State v. Paumier*, 176 Wn.2d

29, 35, 288 P.3d 1126 (2012). If a closure has occurred, "[f]ailure to conduct the *Bone-Club*

analysis is structural error warranting a new trial." *Paumier*, 176 Wn.2d at 35.

    2. Jurors no. 28 and 48

Phelps contends that the "record does not reflect how or when [jurors no. 28 and 48] were

excused" and, accordingly, we should *assume* the trial court violated his right to an open and

public trial. Br. of Appellant at 13. We reject this argument because it misrepresents the record

in this case, and on appeal, Phelps carries the burden to demonstrate that a public trial violation

occurred.

We have previously addressed the burden of proof on appeal for a public trial violation

claim. In both *State v. Halverson*, 176 Wn. App. 972, 977, 309 P.3d 795 (2013), *review denied*,

179 Wn.2d 1016 (2014), and *State v. Miller*, 179 Wn. App. 91, 316 P.3d 1143 (2014), we

stressed that the appellant bears the burden of establishing a public trial violation. In every

public trial right case cited by Phelps in his briefing, the record clearly established a courtroom

closure.

---

[3] Although only four justices signed the lead opinion in *Sublett*, a majority adopted the "experience and logic" test with Justice Stephens's concurrence. 176 Wn.2d at 136 (Stephens, J., concurring). More recently, our Supreme Court cited *Sublett* in unanimously applying the "experience and logic" test in *In re Personal Restraint of Yates*, 177 Wn.2d 1, 28-29, 296 P.3d 872 (2013).

For example, in *Bone-Club*, the trial court expressly ordered a courtroom closure during a pretrial suppression hearing. 128 Wn.2d at 256. Also, in *State v. Brightman*,[4] *In re Pers. Restraint of Orange*,[5] and *State v. Njonge*,[6] the trial court explicitly ordered closures or told the public that they could not attend voir dire proceedings because of space and security concerns. And in *State v. Leyerle*, 158 Wn. App. 474, 477, 242 P.3d 921 (2010), the record clearly reflected (and both parties agreed) that the trial court and both parties questioned a potential juror in a hallway outside the courtroom. Finally, in *Paumier*, 176 Wn.2d at 33, *Wise*, 176 Wn.2d at 7, and *State v. Strode*, 167 Wn.2d 222, 224, 217 P.3d 310 (2009), the trial court individually questioned jurors in camera during voir dire. In all these cases, the appellate record clearly established that the public was inappropriately excluded from some portion of a public trial.

Here, in contrast, nothing in the record establishes that a closure occurred during voir dire or that jurors no. 28 and 48 were privately questioned or dismissed from the jury pool. Before voir dire commenced, the trial court stated that "if there are people, as I assume there will be, indicating that the length of the trial is a problem, I will do the questioning on that and then reserve ruling until I see—until just before peremptory challenges and I'll inform counsel as to who will be excused and who will be retained." 1 RP at 3.

During voir dire, jurors no. 28 and 48 both indicated that the timing and length of the trial would be a hardship. Just as the trial court indicated, it refrained from excusing these jurors at

---

[4] 155 Wn.2d 506, 511, 122 P.3d 150 (2005).

[5] 152 Wn.2d 795, 802, 100 P.3d 291 (2004).

[6] 161 Wn. App. 568, 571-72, 255 P.3d 753 (2011), *review granted*, No. 86072-6 (Wash. Apr. 8, 2013)

this preliminary phase of voir dire. Instead, the record reflects that juror no. 28 was actively involved during voir dire, and that juror no. 48 was at least mentioned at the end of voir dire.

At the close of voir dire, the parties had a sidebar discussion to exercise peremptory challenges and pick the jury. Jurors no. 28 and 48 were not selected for the jury. The record does not reflect that jurors no. 28 and 48 were excused outside of the courtroom or that any type of courtroom closure occurred. Because the record does not establish that jurors no. 28 and 48 were excused during a closed proceeding, Phelps has failed to meet his burden of establishing a public trial violation.

To the extent that Phelps argues that a public trial right violation occurred when the parties selected the jury at sidebar, this argument has been rejected. In *State v. Love*, 176 Wn. App. 911, 920, 309 P.3d 1209 (2013), Division Three of this court held that "[n]either prong of the experience and logic test suggests that the exercise of cause or peremptory challenges must take place in public," and "the trial court did not erroneously close the courtroom by hearing the defendant's for cause challenges at sidebar." 176 Wn. App. at 920. In so holding, the *Love* court reasoned that logic "does not indicate that [cause or peremptory] challenges need to be conducted in public," and that, with regard to *Sublett*'s experience prong, "over 140 years of cause and peremptory challenges in this state" showed "little evidence of the public exercise of such challenges, and some evidence that they are conducted privately." *Love*, 176 Wn. App. at 919. We adopt the reasoning of the *Love* court and hold that exercising for cause challenges at sidebar during jury selection does not implicate the public trial right.[7]

---

[7] In *State v. Dunn*, ___ Wn. App. ___, 321 P.3d 1283 (2014), we adopted the reasoning of the *Love* court and held that exercising peremptory challenges at the clerk's station does not implicate the public trial right.

### 3. Juror no. 62

Phelps next argues that the colloquy between the trial court and juror no. 62 "suggests that jurors were questioned and excused behind closed doors." Br. of Appellant at 13. Phelps further argues that although juror no. 62 was excused for cause on the record in open court, we should assume a public trial violation occurred before or during voir dire.

This argument again misstates the defendant's burden of proof on appeal for a public trial violation claim. While Phelps is correct that in camera or outside-of-the-courtroom questioning of venire members may violate the public trial right, it is Phelps's burden to establish a violation and perfect the record for appellate review. *Miller*, 179 Wn. App. ___ at ¶ 14, 316 P.3d at 1148.

Here, the record is unclear as to when, where, or why the trial court previously spoke with juror no. 62. Thus, this claim relies, at least in part, on facts outside the record on appeal, and we do not address issues on direct appeal that rely on facts outside the record. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Accordingly, we hold that, on the record before us, Phelps has not established that a public trial right violation occurred in regard to the questioning of juror no. 62.

### 4. Other Proceedings

Phelps next argues that "[t]he trial court erroneously held additional in camera hearings without undertaking *Bone-Club* analysis." Br. of Appellant at 14. But Phelps fails to adequately explain what these in camera proceedings concerned, whether they implicated the public trial right, and how any violation of the public trial right occurred. We do "not consider conclusory arguments unsupported by citation to authority." *State v. Mason*, 170 Wn. App. 375, 384, 285 P.3d 154 (2012), *review denied*, 176 Wn.2d 1014 (2013); *see also* RAP 10.3(a)(6). "Such

'[p]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.'" *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012) (quoting *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998)). Accordingly, we refrain from addressing this argument.

B.     RIGHT TO BE PRESENT

Phelps next argues that the trial court "violated his Fourteenth Amendment right to be present at all critical stages of trial" by excusing jurors in his absence. Br. of Appellant at 17. Because nothing in the record reflects that the trial court excused jurors in Phelps's absence, we disagree.

Whether a defendant's constitutional right to be present has been violated is a question of law reviewed de novo. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). A criminal defendant has a constitutional right to be present at all critical stages of the proceedings. *Irby*, 170 Wn.2d at 880. "[A] defendant has a right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fulness [sic] of his opportunity to defend against the charge." *Irby*, 170 Wn.2d at 881 (quoting *Snyder v. Mass.*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)). "The core of the constitutional right to be present is the right to be present when evidence is being presented." *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 306, 868 P.2d 835 (1994). "A violation of the due process right to be present is subject to harmless error analysis." *Irby*, 170 Wn.2d at 885. "[T]he burden of proving harmlessness is on the State and it must do so beyond a reasonable doubt." *State v. Caliguri*, 99 Wn.2d 501, 509, 664 P.2d 466 (1983)).

12

Here, Phelps argues that "[a]t some point, the trial court questioned and excused jurors outside the courtroom" and, this process "affected the makeup—and hence the fairness—of the jury that presided over [his] fate." Br. of Appellant at 18. As explained above, nothing in the record suggests that any jurors were dismissed in Phelps's absence. Jurors no. 28 and 48 were excused for cause in open court, in Phelps's presence. And juror no. 62 was excused for cause on the record in open court. Phelps has failed to meet his burden of establishing error.

To the extent that Phelps argues that his right to be present was violated because jurors were dismissed at sidebar, this claim also fails. Here, the record is not clear as to whether Phelps was present when the attorneys exercised their for cause challenges at sidebar. Phelps was present during voir dire, and it appears that Phelps's claim is based on the allegation that he did not join counsel at sidebar when they exercised for cause challenges.[8] There is no indication in the record that he did or did not accompany counsel when counsel exercised for cause challenges at sidebar. Because the record is unclear whether Phelps was present at sidebar during the exercise of for cause challenges, the claim relies, at least in part, on facts outside the record on appeal. We do not address issues on direct appeal that rely on facts outside the record. *McFarland*, 127 Wn.2d at 335.

C.    DEFICIENT CHARGING DOCUMENT

Phelps next argues that the information charging him with second degree sexual misconduct with a minor was deficient because it failed to allege that AA was not more than 21 years old at the time of the offense. Because this apparently missing element may be fairly implied from the charging document, we disagree.

---

[8] Phelps has presented no authority that "being present" requires standing beside counsel during a sidebar.

No. 43557-8-II

We review challenges to the sufficiency of a charging document de novo. *State v. Williams*, 162 Wn.2d 177, 182, 170 P.3d 30 (2007). When, as here, a defendant challenges an information's sufficiency for the first time on appeal, we liberally construe the document in favor of validity. *State v. Kjorsvik*, 117 Wn.2d 93, 105, 812 P.2d 86 (1991). "Words in a charging document are read as a whole, construed according to common sense, and include facts which are necessarily implied." *Kjorsvik*, 117 Wn.2d at 109. This court's standard of review comprises an essential-elements prong and an actual-prejudice prong. *Kjorsvik*, 117 Wn.2d at 105. Under the essential-elements prong, the reviewing court looks to the information itself for *some* language that gives the defendant notice of the allegedly missing element of the charged offense. *Kjorsvik*, 117 Wn.2d at 105-06. If that language is vague or inartful, then this court determines under the actual-prejudice prong whether such language prevented the defendant from receiving actual notice of the charged offense, including the allegedly missing element. *Kjorsvik*, 117 Wn.2d at 106.

Here, the third amended information states:

> On or about and between March 25, 2011 through April 3, 2011, in the County of Lewis, State of Washington, the above-named defendant, (b) being at least sixty (60) months older than the student and being a school employee and not being married to the student and not being in a state registered domestic partnership with the student, did have, or knowingly cause another person under the age of eighteen (18) to have, sexual contact with a registered student of the school who is at least sixteen (16) years old, to-wit: [AA] (DOB: [1994]); contrary to the Revised Code of Washington 9A.44.096.

Clerk's Papers (CP) at 43.

To convict Phelps of second degree sexual misconduct with a minor, the State had to prove beyond a reasonable doubt that (1) Phelps had sexual contact with AA, (2) AA was at least 16 at the time of the contact but younger than 21, (3) AA was not married to Phelps, (4) Phelps

14

was at least 60 months older than AA at the time of the sexual contact, (5) Phelps was employed by the school, and (6) AA was an enrolled student of the school employing Phelps. RCW 9A.44.096.

Phelps argues that the charging document is insufficient under the essential-elements prong of the *Kjorsvik* test because it failed to explicitly state that AA was younger than 21 at the time of the crime. Although inartfully written, the State's charging document plainly states AA's date of birth, indicating that she was 16 at the time of the alleged sexual misconduct. Moreover, the document lists the charged crime itself as "sexual misconduct with a minor in the second degree," implying the involvement of a "minor."[9] CP at 43. Keeping in mind the liberal standard in *Kjorsvik*, it is clear that, whether the age of majority specific to these circumstances was 18 or 21, Phelps had notice that the charged crime involved sexual contact with someone younger than the age of majority. Accordingly, the missing element can be "fairly implied" in these circumstances. *Kjorsvik*, 117 Wn.2d at 104.

Although the missing element can be fairly implied, we must determine under the actual-prejudice prong whether the defendant can "show that he or she was nonetheless actually prejudiced by the inartful language which caused lack of notice." *Kjorsvik*, 117 Wn.2d at 106. Here, Phelps cannot establish prejudice.

Even if the charging document explicitly stated that the victim must be under 21 years of age, Phelps's potential defenses (consent or alibi) were not affected as it was undisputed throughout trial that AA was 16 years old at the time the alleged sexual misconduct occurred.

---

[9] Although "minor" is not defined in RCW 9A.44.096, under Washington law "[e]xcept as otherwise specifically provided by law, all persons shall be deemed and taken to be of full age for all purposes at the age of eighteen years." RCW 26.28.010. RCW 9A.44.096 is one of the rare exceptions where it is possible for someone over 18 to be treated as a minor.

"The primary goal of the essential elements rule is to give notice to an accused of the nature of the crime that he must be prepared to defend against." *State v. Lindsey*, 177 Wn. App. 233, 245, 311 P.3d 61 (2013) (citing *Kjorsvik*, 117 Wn.2d at 101). Therefore, based on facts in this record, whether Phelps thought he was defending against the charge that he had inappropriate sexual contact with a 16-year-old or with someone under the age of 18 or under the age of 21 is immaterial. Accordingly, Phelps has failed to show that he was prejudiced by the inartful language in the charging document, and Phelps's argument fails.

D.    UNANIMITY INSTRUCTION

Phelps next argues that the trial court violated his right to a unanimous jury verdict by failing to give a unanimity instruction for the second degree sexual misconduct with a minor charge. Specifically, he argues that the State "presented evidence that Mr. Phelps had sexual contact with [AA] on multiple occasions." Br. of Appellant at 23. While it is true that the State presented evidence of multiple acts of sexual misconduct in this case, the jury instructions clearly indicated that the charged crime only involved acts "on or about and between March 26, 2011 through April 2, 2011." CP at 152. At trial, the only evidence presented of sexual contact during this time frame involved the April 2 incident. Accordingly, no election or unanimity instruction was required.

We review alleged instructional errors de novo. *State v. Sibert*, 168 Wn.2d 306, 311, 230 P.3d 142 (2010). "Criminal defendants in Washington have a right to a unanimous jury verdict." *State v. Ortega-Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). Accordingly, when the State presents evidence of multiple acts that could each form the basis of one charged crime, "either the State must elect which of such acts is relied upon for a conviction or the court must

instruct the jury to agree on a specific criminal act." *State v. Coleman*, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). This requirement "assures a unanimous verdict on one criminal act" by "avoid[ing] the risk that jurors will aggregate evidence improperly." *Coleman*, 159 Wn.2d at 512. "Where there is neither an election nor a unanimity instruction in a multiple acts case, omission of the unanimity instruction is presumed to result in prejudice." *Coleman*, 159 Wn.2d at 512. Reversal is required unless we determine the error is harmless beyond a reasonable doubt. *Coleman*, 159 Wn.2d at 512.

Here, the trial court instructed the jury that, to convict Phelps of second degree sexual misconduct with a minor, the State needed to prove beyond a reasonable doubt "[t]hat on or about and between March 26, 2011 through April 2, 2011, the defendant had sexual contact with [AA]." CP at 152. The trial court defined "sexual contact" as:

> Sexual contact means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party. Contact is "intimate" if the conduct is of such a nature that a person of common intelligence could fairly be expected to know that, under the circumstances, the parts touched were intimate and therefore the touching was improper.
> When considering whether a particular touching is done for the purpose of a gratifying sexual desire, you may consider among other things the nature and the circumstances of the touching itself.

CP at 153.

At trial, the State presented evidence of only one incident involving sexual contact between AA and Phelps *during the date range in question*. This was the April 2 incident where Phelps straddled AA while she was on his bed, kissed her on the lips, put his tongue in her mouth, and ground his erection between her legs. Because the State presented evidence of only one incident involving sexual contact between AA and Phelps during the date range in question,

17

it was not required to make an election, and the trial court did not err in refraining from giving a unanimity instruction in this situation.

Phelps also argues that a unanimity instruction was required because the State presented evidence of more sexual misconduct after April 2. This argument is unavailing. As already discussed, the State charged Phelps with committing sexual misconduct between a specified date range, March 26 to April 2, and the jury instructions repeated that the jury had to find that the misconduct occurred during that date range. We presume that juries follow the trial court's instruction. *State v. Hanna*, 123 Wn.2d 704, 711, 871 P.2d 135, *cert. denied*, 513 U.S. 919 (1994). Accordingly, while the State admittedly presented evidence of other acts involving sexual contact, none of those acts took place in the specified date range and could not have been the basis for the jury's conviction on the sexual misconduct charge.

E.      PROSECUTORIAL MISCONDUCT

Phelps last argues that the prosecutor committed misconduct during closing argument. We disagree.

To prevail on a prosecutorial misconduct claim, the defendant must establish "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). We look to "the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury'" when looking at the context of the entire record. *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)). Moreover, a defendant's failure to object to an

improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).

During closing statements, Phelps's attorney argued to the jury that:

> You can find [Phelps] not guilty for the rape for two reasons. There was no rape and [Phelps] wasn't there. And I'm going to give you arguments for both. [AA] tells us that she disclosed to her aunt, disclosed to her mom and dad, and disclosed to [police] that she had sexual intercourse with Todd Phelps.
> And on cross-examination, I asked her about some of that stuff. And on some of my questions she agreed, "I didn't say no." And she can come in here and testify this is the detailed sequence of events, but she can't get away from the other things she's already told her aunt and mom and dad and [police].
> And then the prosecutor, why would the prosecutor have in her notes that [AA] said she consented? Why would the prosecutor have in her notes that [AA] said she consented if [AA] didn't consent?". . .
>
> . . . .
>
> And I guess during their conversations during their seemingly private conversations when she was talking with the prosecutor and not with me, she told them that it was consensual. She can't get away from that.

8 RP at 1571-72.

In its rebuttal, the State argued the following without objection,

> I will be as brief as possible, but I definitely need to address these points that [defense counsel] has raised because I got to be quite honest with you today, I didn't know the defense was one of consent. So I guess [Phelps] was either there or he wasn't. If he was there, you are to believe that [AA] consented somehow. Well, let's work through that. So if you believe [AA] that [Phelps] was there, is there any evidence at all, at all, that [AA] consented?
> The only evidence that [defense counsel] wants you to hang your hat on is that he had [AA] when she was cross-examined, say—agreed that . . . when she was giving a statement that she said, "No, I didn't stop him." But when I questioned her with regard to that as to when that conversation was in relation to, she was specific. It was after he had already entered her with his penis. She was clear about that. It was not beforehand. It was after.
>
> . . . .
>
> Now, the other thing that [defense counsel] tries to discredit [AA] with regard to consent is some notes that the Prosecutor's Office had. He asked her, well, didn't you have an interview with the Prosecutor's Office? Unfortunately,

> [defense counsel] wasn't there. He's grasping at straws to get anything. He has no idea of [what the] context was of the interview. He doesn't even know what the notes were about, but we're obligated to give them to him. Not dated.
>
> . . . .
>
> So which is it? Was [Phelps] there and he raped [AA] or had sex with her or he wasn't there?

8 RP at 1580-82.

Phelps contends that the prosecutor's statement that he did not realize that consent was at issue implied "that the defense had been forced to change theories based on the evidence." Br. of Appellant at 28. "[T]he prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995) Here, a fair reading of the record does not reflect that the prosecutor's comment was "calculated to inflame the passions or prejudices of the jury." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Instead, although the prosecutor was surprised[10] by the defense's argument that AA had consented to sexual intercourse with Phelps and expressed that surprise in its brief comment, the prosecutor then went on to explain why the evidence could not support a theory of consent, especially in light of AA's extensive testimony. "It is not misconduct . . . for a prosecutor to argue that the evidence does not support the defense theory." *Russell*, 125 Wn.2d at 87.

Phelps also argues that the prosecutor's statement that defense counsel was "grasping at straws to get anything" while discussing AA's interview with the prosecutor's office was an

---

[10] Throughout trial, Phelps's defense focused almost exclusively on establishing that Phelps could not have committed the rape when the State argued it occurred and, additionally, that no evidence of the rape remained at the crime scene.

inappropriate comment on the evidence and that this expressed the prosecutor's personal opinion about Phelps's guilt. 8 RP at 1582. This argument is unpersuasive.

First, Phelps's argument about consent relied exclusively on a handwritten note in the margin of a statement seemingly written by one of the prosecutors. It was appropriate for the prosecution to point out that defense counsel was not at the interview and could not know the context of the note or what the prosecutor was thinking when the note was written. *Russell*, 125 Wn.2d at 87. Second, the "grasping at straws" comment was clearly directed to defense counsel's theory of the case and did not reflect the prosecutor's personal view of Phelps's guilt or innocence. 8 RP at 1582. Phelps fails to establish prosecutorial misconduct in these circumstances.

F.     INEFFECTIVE ASSISTANCE OF COUNSEL

Phelps also argues that his trial counsel was ineffective for failing to object to the prosecutor's above-described statements in closing argument. To demonstrate ineffective assistance, a defendant must show that (1) defense counsel's representation was deficient because it fell below an objective standard of reasonableness; and (2) the deficient representation prejudiced the defendant because there is a reasonable probability that the result of the proceeding would have been different except for counsel's errors. *McFarland*, 127 Wn.2d at 334-35. Here, because Phelps fails to establish prosecutorial misconduct, he cannot show that his trial counsel was deficient for failing to object, and this argument necessarily fails.

No. 43557-8-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Bjorgen, P.J.

_____
Maxa, J.